14-1826
Davis v. Velez

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2014

(Argued: April 22, 2015 Decided: August 4, 2015)

Docket No. 14-1826

---

LEROY DAVIS,

Plaintiff-Appellee,

- v. -

JAVIER VELEZ, JAMES LUKESON, and GARY CALHOUN,

Defendants-Appellants.*

---

Before: KEARSE, PARKER, and WESLEY, Circuit Judges.

Appeal from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Jack B. Weinstein, Judge, awarding plaintiff, who had previously been acquitted of drug and firearm charges, a total of $560,000 in compensatory and punitive damages against defendant police officers pursuant to 42 U.S.C. § 1983 for false arrest, malicious prosecution, and denial of a fair trial. On appeal, defendants contend principally that they

---

* The Clerk of Court is directed to amend the official caption to conform with the above.

are entitled to a new trial because of the admission of hearsay evidence that another person said he had framed plaintiff for those crimes, and because of improprieties by the jury in its deliberations. See 15 F.Supp.3d 234 (2014).

Affirmed.

MICHAEL LUMER, New York, New York (James C. Neville, Lumer & Neville, New York, New York, on the brief), for Plaintiff-Appellee.

TAHIRIH M. SADRIEH, Assistant Corporation Counsel, New York, New York (Zachary W. Carter, Corporation Counsel of the City of New York, New York, New York, on the brief), for Defendants-Appellants.

KEARSE, Circuit Judge:

Defendants Javier Velez and James Lukeson, officers in the New York City Police Department ("NYPD"), and defendant Gary Calhoun, an NYPD sergeant, appeal from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Jack B. Weinstein, Judge, ordering Velez and Lukeson each to pay plaintiff Leroy Davis $180,000 in compensatory and punitive damages, and ordering Calhoun to pay Davis $200,000 in compensatory and punitive damages, on Davis's claims brought under 42 U.S.C. § 1983 for false arrest, malicious prosecution, and denial of a fair trial. Davis had been arrested by defendants, leading to a federal prosecution on charges of possession of narcotics and a firearm, but he was acquitted on all counts. On appeal in the present case, defendants contend principally that they are entitled to a new trial (1) because of various evidentiary rulings, including the admission of hearsay evidence as to

statements by a person who said he had planted the drugs and firearm that defendants claimed to have found in Davis's possession, and (2) because of improprieties in the jury deliberations. Lukeson and Calhoun also contend that they were entitled to judgment as a matter of law dismissing Davis's claims against them for malicious prosecution. For the reasons that follow, we conclude that defendants' contentions provide no basis for reversal.

## I. BACKGROUND

The present civil action has its origin in defendants' arrest of Leroy Davis ("Leroy" or "Davis") in 2009. The differing versions of that event, and Davis's evidence as to how the arrest came to pass, are described in the district court's opinion denying defendants' motions for a new trial, see Davis v. Velez, 15 F.Supp.3d 234 (E.D.N.Y. 2014) ("D.Ct. Op."), familiarity with which is assumed.

> Defendants arrested plaintiff [Davis] on October 2, 2009. They claimed that one of them saw plaintiff furtively drop a plastic bag on a public sidewalk, heard a metallic clink that sounded like a gun, and found a gun and crack cocaine inside the bag. Based on evidence supplied by defendants, plaintiff was indicted by a federal grand jury. . . . After spending thirteen months in jail awaiting trial, plaintiff was tried on federal gun and drug charges. He was acquitted of all charges.

D.Ct. Op., 15 F.Supp.3d at 237. After his acquittal, Davis commenced the present action pursuant to 42 U.S.C. § 1983 for, to the extent pertinent to this appeal, false arrest, malicious prosecution, and denial of a fair trial.

### A. Defendants' Version of the Arrest

Defendants testified that in the early hours of October 2, 2009, they were in an

unmarked car, dressed in plainclothes, on an overnight patrol in Brooklyn, New York. (See Trial Transcript ("Tr.") 290-92, 397, 410-11.) As they turned a corner and drove slowly along the 600 block of Chauncey Street (or "Chauncey"), Velez, sitting in the back seat of the car, saw a man--Davis--walking down the block, carrying a black plastic bag. Velez testified that Davis glanced back toward the officers and then dropped the bag, and Velez heard what sounded like the metallic sound that a firearm makes when it hits the ground. "Without saying anything to his colleagues, Officer Velez jumped out of the slowly moving car and asked the pedestrian what was in the bag." D.Ct. Op., 15 F.Supp.3d at 239. When Davis responded "garbage" (Tr. 298), Velez looked in the bag and saw a bottle of soda, a box of chicken and, beneath the box, a firearm and ziplock bags of crack cocaine.

Velez and Lukeson handcuffed Davis and patted him down. They testified that he had no identification. Lukeson testified that when Davis indicated that he lived in 642 Chauncey, Lukeson took Davis's house keys from his pocket or belt and used them to enter 642 Chauncey in order to determine whether someone could identify Davis or produce identification for him. He knocked on interior doors on the ground floor, got no answer, and left the building. He testified that he was in the house for at most 25-30 seconds. Calhoun testified that Lukeson had gone into 642 Chauncey and had been inside for 30-35 seconds.

Davis was thereafter promptly taken to the precinct. Lukeson did not see the contents of the black plastic bag until he was at the precinct. Neither Calhoun nor Lukeson had seen Davis holding the bag. They testified that they first saw it when it was on the ground or when Velez was holding it. Neither Lukeson nor Calhoun was asked at trial whether they had heard a metallic clink or sound. See D.Ct. Op., 15 F.Supp.3d at 239-40.

B. Davis's Version of the Arrest

Davis testified that on the night in question he had neither been walking down Chauncey Street nor carrying a bag. Rather, he and a friend had just come out of 642 Chauncey, where Davis lived; and Davis was about to go next door to 640 Chauncey to see his then-girlfriend who was living there with her grandmother. Davis had just locked the gate to 642 Chauncey when he was approached by Lukeson and Velez, who ordered him to put his hands on the gate and told his friend to leave.

Davis testified that he had with him not only the keys to 642 Chauncey but also his Social Security card and a benefit card as identification. Either Velez or Lukeson took the keys from Davis's pocket. Some 10 minutes later, Davis heard that officer say "put handcuffs on him." (Tr. 455.) He was then taken to the police station.

Two other witnesses called by Davis testified to their observations of the scene at 642 Chauncey on October 2, 2009, around 1:00 a.m., just after Davis's arrest. Shakima Jones (or "Shakima" or "Kima"), the sister of Layshonna Jones who was Davis's then-girlfriend, testified that she was returning from a party to her grandmother's house at 640 Chauncey and saw Davis and his friend sitting on the ground in handcuffs. She saw two police officers with them--recognizing them as police officers because they had guns and flashlights--and another officer standing on the stoop of 642 Chauncey smoking a cigarette. Among the officers she saw were Velez and Lukeson. (See Tr. 166-67.) Shakima and her companion Rasheem Kelly (or "Rasheem"), who was a grandson of Mary Jackson, the owner of 642 Chauncey, then remained across the street from 640 and 642 Chauncey and watched. Shakima testified that for some 20-30 minutes there appeared to be a number of officers moving around with flashlights inside 642 Chauncey.

After the officers had left, Rasheem went into 642 Chauncey to check the house. He told Shakima that mattresses, drawers, and a stove had been moved around. (See id. at 216-17; see also id. at 168 (the "next day we went to the house and . . . help[ed] Mrs. Jackson put a lot of stuff back together").)

Vincent Holmes, who lived at 644 Chauncey, testified that he was arriving home from work and saw Davis and another man being detained by police just outside the gate to Holmes's house. After speaking briefly with one of the officers, Holmes stood on his front steps for some five minutes and watched. Holmes saw another officer exit 642 Chauncey carrying a box, show the box to an officer who was smoking a cigarette, and then go back into 642 Chauncey.

Velez testified that he did not remember seeing Shakima Jones on the street that night, or seeing anyone go in and out of 642 Chauncey, or seeing an officer bringing out a box. (See Tr. 331-32, 355; id. at 332 ("I would not be able to tell you whether it happened or not, I don't remember ever seeing it.").)

C. The Role of Terrel Norman

Davis denied that he had possessed crack or a gun that night and that he had ever had crack or a gun in 642 Chauncey. His theory was that he had been framed by Terrel Norman, a relative of Mary Jackson, the woman who owned 642 Chauncey. Davis had moved to 642 Chauncey in April 2009, having become a good friend of Jackson's son, whom Davis regarded as a father or an uncle. Davis and Jackson developed a good relationship; he helped her with gardening, baking, and maintenance, and called her "grandmother" (Tr. 437; see also id. at 132 (Shakima heard Davis refer to Jackson as "Grandma")). Jackson bought Davis clothes and furniture for his room and gave him

money.

Norman, a grandson or nephew of Jackson--generally referred to as her grandson--who sometimes stayed at 642 Chauncey, became jealous of Davis, recognizing that Davis was more welcome there than he was (see, e.g., id. at 144 (Shakima Jones observed many occasions when Jackson was "upset with Terrel Norman coming into her house"); see also id. at 177 (Shakima observed that Davis had keys to Jackson's house but never observed Norman having such keys)). Pursuant to pretrial rulings (see Part II.A. below), Davis was allowed to present evidence at trial as to statements by Norman (see Part I.D. below) that supported Davis's theory that Norman had planted the gun and crack in 642 Chauncey in order to frame Davis (the Norman "Confession").

Shakima Jones testified that on one occasion in May 2009 when she was in the front yard of her grandmother's house at 640 Chauncey, she heard screaming and yelling coming from 642 Chauncey. Norman came storming out, saying, "this is what you want to do to me, grandma"; "[t]his is how you are going to treat me. I am your flesh and blood. You are going to let a stranger live here before you let us stay in your house. This is wrong. This is wrong. I can't deal with it." (Tr. 139-40.)

Clara Jones (or "Clara"), the mother of Shakima and Layshonna Jones, testified that sometime before Davis's October 2009 arrest, perhaps in the summer, when Clara was in front of her mother's house at 640 Chauncey, Davis and Norman emerged from 642 Chauncey in the midst of an argument in which each had grabbed the other by the shirt. Norman was saying to Davis, "You getting on my nerves, you make me sick. That's all right. I'm going to get you. I'm going to get you." (Id. at 108.)

Davis testified that he witnessed quarrels between Norman and Jackson, in which Norman asked Jackson why she treated Davis better than she did Norman (see, e.g., Tr. 441 (Norman

asked Jackson, "Why you always giving Leroy money and don't give me no money?")), and Jackson asked Norman, "Why you cannot be like Leroy?" (id. at 442). On October 1, 2009, when one of these quarrels between Norman and Jackson became physical and Norman lunged toward his grandmother, Davis grabbed Norman and the two tussled, causing a gun to fall out of Norman's pants. Davis picked up the gun and gave it to Jackson; Jackson gave the gun back to Norman and told him to get out of her house. Norman said to Davis, "I'm going to get you. I'm going to get you." (Id. at 443.)

Hours later, Davis was arrested.

D. The Norman "Confession"

Shakima Jones testified that she had known Norman all of his life, as their families were neighbors, and that they frequently socialized. She had conversations with Norman "[a]ll the time" "through the years." (Tr. 171.) On several occasions she had observed Norman possessing guns, and she had observed him possessing various controlled substances. Some two weeks after Davis moved into 642 Chauncey, Shakima was in the front yard of that house with Norman and his cousin Rasheem when Norman, saying "I got some new toys," showed them four guns (id. at 136). On a different occasion, Shakima witnessed Norman pull out a gun and point it at Rasheem during an argument. (See id. at 150; see also id. at 439-40 (Davis observed Norman pointing a gun at Rasheem).) On another occasion, Norman got Shakima to let him leave two duffel bags in her house at 650 Chauncey; Norman later took a gun, a package of crack cocaine, and a bag of pills he said were ecstasy out of one of those bags, and Shakima saw another gun remaining in the bag. (See id. at 138-43.) And on yet another occasion, when Jackson was away and Davis would not unlock the gate and door to let him in, Shakima observed Norman enter 642 Chauncey through a window; and,

after hearing shouting coming from the house, she saw Norman run down the block and fire several shots into the air. (See id. at 144-49, 543; see also id. at 523-25 (Davis describing that incident).)

Shakima testified that in the summer of 2013--although she admitted she might be mistaken about the timing (see Tr. 193)--Norman had come to Brooklyn from somewhere in the South where he was then living, and he and his brother called her to come over to their aunt's house for a visit. During that visit, Norman brought up the subject of Davis and told Shakima that he, Norman, had put the gun and the bags of crack for which Davis was arrested on October 2, 2009, in 642 Chauncey. Norman said he had done it in order to "kill two birds with one stone," i.e., to get rid of both "Leroy Davis and that gun." (Id. at 174, 175.) Norman said he wanted Davis out of his grandmother's house (see id. at 176-77, 180), and he said "I really, really needed to get rid of that gun anyway, Kima, you don't understand" (id. at 176).

Shakima testified that Norman said that on that night in October 2009, after putting the gun and the crack in 642 Chauncey (see id.), he had called policemen, to whom he referred as the "Three Amigos"--mentioning the names "Velez" and "Calhoun" and calling them "my boys" (id. at 178). Norman told Shakima that he had put the gun and the drugs in a crawl space toward the roof. (See id. at 178-79.) Norman said that "when he called" the Three Amigos, "he called Velez" but got "no answer. So he called Calhoun" and gave Calhoun "the information." (Id. at 179.) Norman told her that Calhoun had responded, "we're on our way." (Id. at 180.)

Defendants denied ever having heard of Norman and denied receiving a tip related to Davis or 642 Chauncey. (See Tr. 370, 405, 415-16.)

E. The Verdicts

The jury returned verdicts in favor of Davis against each of the defendants on each of three claims: false arrest, malicious prosecution, and denial of a fair trial by providing false information to prosecutors. It awarded compensatory damages against each defendant in the amount of $54,000; it awarded punitive damages against Velez and Lukeson in the amount of $126,000 each and against Calhoun in the amount of $146,000.

Defendants made several motions for a new trial. They argued principally that they were unfairly prejudiced by the admission of the hearsay evidence as to the Norman Confession and by other evidentiary rulings (see Parts II.A. and II.C.1. below) and by events during the jury's deliberations, most of which came to light after the end of the trial (see Part II.B. below). The motions were denied, and judgment was entered reflecting the jury's verdicts.

## II. DISCUSSION

On appeal, defendants contend principally that the trial court erred (1) in admitting evidence of the Norman Confession and excluding offsetting evidence, and (2) in denying a new trial on the basis of information received as to improprieties in the jury deliberations. For the reasons that follow, we see no basis for reversal.

A. Admissibility of the Norman Confession Under Rule 804(b)(3)

Hearsay, a statement by a declarant "not ma[d]e while testifying at the current trial or hearing" and "offer[ed] in evidence to prove the truth of the matter asserted in the statement," Fed. R.

Evid. 801(c), is generally not admissible unless permitted by an exception provided in the Federal Rules of Evidence ("Rules"), see Fed. R. Evid. 802. The Rules provide exceptions for, inter alia, a hearsay statement that was against the declarant's penal interest if the declarant is unavailable as a witness, see Fed. R. Evid. 804(b)(3).

The exception for a statement against a declarant's penal interest applies to a statement that

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3) (emphasis added). The Rule excepting such statements from exclusion on the ground of hearsay "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson v. United States, 512 U.S. 594, 599 (1994).

To the extent pertinent here, a declarant is unavailable as a witness if he is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1). The trial court may permissibly find that a declarant is unavailable on the ground of privilege "with or without the [declarant] being haled into court" to invoke the privilege, where, for example, the court reasonably relies on "representations of the attorneys for . . . incarcerated [declarants] concerning their clients' intentions to rely on their Fifth Amendment privileges." United States v. Williams, 927 F.2d 95, 99 (2d Cir.), cert. denied, 502 U.S. 911 (1991); see id. ("The law does not require the doing of a futile act.").

The trial court's ultimate decisions as to the admission or exclusion of evidence are reviewed for abuse of discretion, see, e.g., United States v. Gupta, 747 F.3d 111, 128 (2d Cir. 2014), cert. denied, 135 S. Ct. 1841 (2015); Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 619-20 (2d Cir. 1991), and will not be disturbed unless they are "manifestly erroneous," SR International Business Insurance Co. v. World Trade Center Properties, LLC, 467 F.3d 107, 119 (2d Cir. 2006) (internal quotation marks omitted); In re Martin-Trigona, 760 F.2d 1334, 1344 (2d Cir. 1985) (internal quotation marks omitted). Further, even an erroneous ruling does not warrant a reversal "[u]nless justice requires otherwise." Fed. R. Civ. P. 61; see, e.g., Lore v. City of Syracuse, 670 F.3d 127, 155 (2d Cir. 2012); Healey v. Chelsea Resources, Ltd., 947 F.2d at 620.

On this appeal, defendants do not suggest that the Norman Confession to which Shakima testified--indicating that Norman (who was a previously convicted felon) had possessed a gun and had conspired with police officers to incriminate and cause the conviction of an innocent man--did not consist of statements against his penal interest. Rather, defendants contend principally that the district court erred (1) in ruling that Norman was unavailable as a witness, and (2) in admitting the Confession without corroborating circumstances supporting its reliability. (See defendants' brief on appeal at 25-33.) Neither contention has merit.

1. Unavailability

Defendants argue principally that it was error for the district court to find that Norman was unavailable on the basis of "post-trial" testimony by Norman's attorney that Norman had told her he would rely on her advice and assert his Fifth Amendment privilege if called to testify (defendants' brief on appeal at 26-27), and that the court erred in failing to make a determination as to whether

Norman would invoke the privilege with respect to each question defendants wished to pose to him. These arguments do not do the record justice, for although there was such posttrial testimony by Norman's attorney, the district court's ruling that Norman was unavailable was made prior to trial, pursuant to a procedure to which defendants had declined to object.

The trial in the present case began on December 9, 2013. In November, defendants moved in limine for rulings that Davis would be precluded from offering into evidence, inter alia, "any evidence regarding Terrell [sic] Norman" (Memorandum of Law in Support of Defendants' Motions In Limine ("Defendants' In Limine Memorandum") at i; see id. at xiii-xv), including "STATEMENTS MADE BY TERRELL [sic] NORMAN" (id. at xv). At the ensuing hearing on the in limine motions, the district court was informed that Norman--who had been listed as a potential trial witness by Davis more than a year earlier--was incarcerated somewhere in the South; that neither side intended to seek Norman's appearance as a witness at trial; and that Davis sought to have the Norman Confession admitted as statements against penal interest. The court instructed Davis to provide evidence of Norman's unavailability to testify. (See Hearing Transcript, November 25, 2013, at 16-25.)

At a hearing on December 3, 2013, the court and the parties were informed by telephone by Norman's criminal defense attorney Paris Branch-Ramadan that she would advise Norman to invoke his Fifth Amendment privilege and to refuse to testify at the trial in the present action. (See Hearing Transcript, December 3, 2013, at 12-13.) The court instructed Branch-Ramadan that after she consulted with Norman, if he indicated that he would nonetheless testify, she should "call me back and tell me that." (Id. at 13.) The court verified that Branch-Ramadan understood that she need not call if Norman would follow her advice not to testify and that "the effect of [her] not calling [the court]" would be to signify that Norman would refuse to testify (id. at 14). The parties

were asked whether they objected to that course of action; each side stated that it had no objection. (See id.) Neither side suggested that information must be obtained question-by-question as to whether Norman would refuse to answer.

Norman's attorney did not call the court. Norman was thus found unavailable. Defendants having agreed to this process cannot complain of it on appeal.

On December 6, defendants moved for reargument of the unavailability determination on the ground that Norman, though incarcerated, had spoken with a defense investigator within the past week and was recorded as having denied planting a gun or drugs against Davis. The statements proffered by defendants, read into the record by the court on the morning trial was to begin, quoted Norman in part as stating that he did not plant the gun or drugs or set up Davis: "I loved him"; "I would never set him up"; "I had love for him, honestly." (Tr. 6.) The district court granted the motion for reconsideration but adhered to its prior decision that Norman was unavailable. The court permissibly concluded that Norman's making unsworn self-serving statements was not sufficient to raise an inference that he would be willing to testify under oath.

Defendants argue, relying principally on United States v. Zappola, 646 F.2d 48, 53-54 (2d Cir. 1981), that the district court could not properly determine that Norman was unavailable on the basis of privilege without conducting an inquiry into whether Norman would invoke his privilege with respect to each specific proposed question (see defendants' brief on appeal at 27-28), including questions that defendants deemed "neutral" (id. at 28). Defendants' reliance on that case is misplaced, for there the subpoenaed witness was a government informant; we ruled that the court's acceptance of a "blanket assertion of the fifth amendment privilege in response to all questions asked of" that witness was inappropriate because as to questions with respect to his activities as a government agent

he would be protected from criminal prosecution, and his answers thus could not incriminate him, 646 F.2d at 53. As to any relevant questions defendants would pose to Norman, however, defendants deny that he was an informant.

Further, as to the potential for neutral questions, defendants provided no list of such proposed questions for Norman, either in the December 3 conference call with his attorney or in their December 6 motion for reconsideration. They merely stated, in a letter dated the day before the Monday December 9 start of trial, that they "would proffer" such a list "upon the Court's request" (Letter from Duane Blackman to Judge Weinstein dated December 8, 2013 ("Defendants' December 8 Letter"), at 4 n.1 (emphasis added)). And in that letter, the example of what defendants apparently viewed as a neutral question--claiming that Norman could answer it "without exposing himself to criminal liability" (id. at 4)--was whether Norman "was on the sidewalk down the block [from 642 Chauncey on the night of Davis's arrest] and watched the arrest" (id. (internal quotation marks omitted)). This was hardly a neutral question since an affirmative answer would place Norman in close proximity to the place where he allegedly admitted putting the gun and the drugs in order to frame Davis. A witness is entitled to claim the privilege if his answer could "'furnish a link in the chain of evidence'" incriminating him. United States v. Rodriguez, 706 F.2d 31, 36 (1983) (quoting Hoffman v. United States, 341 U.S. 479, 486 (1951)).

Defendants alternatively requested a ruling that, if the Norman Confession was admitted, the newly obtained statements from Norman to the investigator too would be admissible. Although defendants argue on appeal that the recording was admissible as impeachment evidence under Fed. R. Evid. 806 ("When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those

purposes if the declarant had testified as a witness."), they did not cite or advert to this Rule in the district court. They asked that the investigator's recording be admitted "to even the field." (Tr. 10.) The court denied the request, finding the Confession and the new statements "entirely different" in character and reliability (id. at 11), see generally Fed. R. Evid. 807 (providing a residual exception for a hearsay statement that is not within Rule 803 or 804, if the statement, inter alia, "has equivalent circumstantial guarantees of trustworthiness"). The district court permissibly found that whereas the Confession bore indicia of reliability because it was contrary to Norman's penal interest, the proffered self-exculpatory statements bore no such indicia.

After these rulings, defense counsel suggested having a telephone conference to take Norman's deposition. The district court stated, "Set it up. I'll be glad to hear him, if he wants to, under oath, after the plaintiff puts in a case . . . saying that he admitted that he set the plaintiff up." (Tr. 11-12; see also id. at 13-14 ("If anybody wants to make him available by bringing him . . . before we have our summations and the evidence closed, I'll hear him, if he gets here. If you can arrange to do it by two-way video, I'll take it . . . . But I'm not going to allow him to testify . . . if all he's going to say is, I plead the Fifth Amendment.").)

We see no indication in the record that defendants ever pursued any of these courses to alter the ruling of unavailability or to procure Norman's testimony under oath. In light of the record as a whole, we cannot conclude that either the procedures or the rulings as to unavailability provide any basis for reversal.

2. Corroboration

Defendants argue that even if Norman was properly ruled unavailable, the Confession should have been ruled inadmissible under Rule 804(b)(3) on the ground that it was not "supported by corroborating circumstances that clearly indicate[d] its trustworthiness," Fed. R. Evid. 804(b)(3)(B). (See defendants' brief on appeal at 28-33.) Although that subpart of the Rule requires such special corroboration where the statement against penal interest "is offered in a criminal case," Fed. R. Evid. 804(b)(3)(B) (emphasis added), defendants urge us to apply the requirement to this civil case, arguing that the concerns for "potential . . . fabrication" warrant such a requirement (defendants' brief on appeal at 31). This Court has not ruled on whether the special corroboration requirement is applicable in civil cases. On this appeal, defendants argue that we should follow the decisions of the Seventh Circuit in American Automotive Accessories, Inc. v. Fishman, 175 F.3d 534, 541 (7th Cir. 1999), and the Third Circuit in In re Flat Glass Antitrust Litigation, 385 F.3d 350, 373 (3d Cir. 2004), cert. denied, 544 U.S. 948 (2005), which applied the corroboration requirement in civil cases. We conclude that this argument is not properly preserved; but even if it were, and even if a special corroboration requirement is appropriate for civil cases, there is no basis for reversal here.

In arguing to the district court that the Norman Confession was not within the Rule 804(b)(3) exception, defendants argued only that the unavailability requirement was unsatisfied; they did not argue that the court was required to find, in this civil case, special corroboration to indicate that Norman's self-inculpatory statement was trustworthy. (See, e.g., Defendants' December 8 Letter at 2 ("To the extent plaintiff argues that statements allegedly made by Norman to Shakima Jones should be admitted as statements against penal interest pursuant to [Rule] 804(b)(3), these arguments fail as Norman is not unavailable under either 804(a)(1) or 804(a)(5)."); id. at 2-4 (elaborating on the

ways in which a witness may be unavailable).) Defendants also quoted a 2008 criminal case that quoted the "corroborating circumstances" requirement as it appeared in the version of Rule 804(b)(3) that was applicable in 2008. (Defendants' December 8 Letter at 2 (quoting United States v. Wexler, 522 F.3d 194 (2d Cir. 2008)).) That pre-2010 version provided that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Fed. R. Evid. 804(b)(3)(B) (1997). But Rule 804(b)(3)(B) had been amended in 2010. As amended in 2010, the Rule states that a statement against the declarant's penal interest is admissible within the exception if it "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B) (2010) (emphasis added).

Defendants did not quote to the district court the 2010 version of Rule 804(b)(3)(B), which introduced the "in a criminal case" language. Davis, in his memorandum to the court in support of admission of the Norman Confession, argued that the "in a criminal case" language meant that the corroborating circumstances requirement was not applicable to civil cases. (See Davis's Memorandum of Law Concerning Plaintiff's Use of Statements by Terrel Norman at 4.) Defendants did not respond to this contention. They presented no argument to the district court as to why special corroboration should also be required in a civil case.

The Seventh and Third Circuit cases mentioned above, which are relied on by defendants on this appeal, had been decided in 1999 and 2004. They too, perforce, dealt with the pre-2010 version of Rule 804(b)(3); but they at least applied the special corroboration requirement in civil cases. Defendants did not cite those cases to the district court.

In sum, although the district court performed the usual balancing analysis under Fed. R. Evid. 403 in considering defendants' contention that the Confession should be excluded as unfairly prejudicial--and "[i]n the evidentiary context, fairness is closely related to the reliability and trustworthiness of the evidence," Felzcerek v. INS, 75 F.3d 112, 115 (2d Cir. 1996)--we see no indication that the district court was presented with the contention now advanced by defendants on appeal: that in order to apply the Rule 804(b)(3) exception to the Norman Confession, it was required to find special corroboration for the Confession's trustworthiness.

Where an alleged error is unpreserved, it will warrant a new trial only if it is "so serious and flagrant that it goes to the very integrity of the trial." Marcic v. Reinauer Transportation Cos., 397 F.3d 120, 124 (2d Cir. 2005) (internal quotation marks omitted); see 28 U.S.C. § 2111 (appellate court is to ignore "errors . . . which do not affect the substantial rights of the parties"). We see no such error here, for even if the special corroboration requirement is applicable in civil cases, there were in the record sufficient indicia of trustworthiness of the Confession statements to which Shakima testified.

First, though defendants complain that the court should not have allowed the introduction of "other act" evidence with regard to Norman, such evidence was properly admitted to show that Norman had access to guns, to drugs, to the house at 642 Chauncey, and to the police--all of which bore on the reliability of the Confession. See generally United States v. Tubol, 191 F.3d 88, 95 (2d Cir. 1999) (evidence that defendant possessed a gun when he was arrested was admissible "to show that he had the means to commit" armed robberies); United States v. Robinson, 560 F.2d 507, 512-13 (2d Cir. 1977) (en banc) (evidence that a defendant possessed a firearm "some weeks" after the armed bank robbery with which he was charged was admissible to show he had the "opportunity" to commit the crime), cert. denied, 435 U.S. 905 (1978).

Further, in deciding preliminary questions as to the admissibility of evidence, the trial court may consider evidence, other than that subject to a privilege, that itself would not necessarily be admissible at trial. See Fed. R. Evid. 104(a). The record here included not only the testimony about Norman that was admitted at the trial in the present case, but also deposition testimony, and testimony from the pretrial and trial proceedings in Davis's criminal case that had been presented to the district court in this case by defendants in support of a motion for summary judgment. In all, there was evidence consistent with virtually every aspect of the Norman Confession.

**Access to guns:** At trial, Shakima testified that in the months prior to Davis's arrest she had observed Norman with numerous guns. He briefly stored at her house at 650 Chauncey a bag that contained two guns; she saw one when he removed it to take it with him and saw the other when she searched the bag. (See Tr. 138-43.) At 642 Chauncey, Norman showed Shakima and Rasheem his "new toys," consisting of four guns. (Id. at 136.) On another occasion, after leaving 642 Chauncey, Norman shot a gun in the air when he was angry with Davis for not having let him into 642 Chauncey. (See id. at 145-49.) Three witnesses testified that, during an argument with his cousin Rasheem, Norman pointed a gun at Rasheem. (See id. at 150 (Shakima); id. at 439-40 (Davis); Transcript of Suppression Hearing in United States v. Davis, No. 09-CR-829 (E.D.N.Y. Aug. 9, 2010) ("Criminal Case Hearing"), at 183 (Rasheem); see also id. at 180-81 (Rasheem testifying that on more than one occasion Norman had asked him to hide guns at 642 Chauncey).) And on the day before Davis was arrested, he and Norman tussled at 642 Chauncey, and a gun fell out of Norman's pants (see Tr. 442-43). At the end of that encounter Norman told Davis, "I'm going to get you." (Id. at 443.) There was ample evidence that Norman possessed guns through October 1, 2009, increasing the likelihood that he possessed or could obtain one to plant for Davis's arrest at 1 a.m. on October 2.

**Access to crack:** Shakima testified at trial that when Norman opened one of the duffel bags he briefly stored at her house, he took out a package of crack, saying he had to deliver it around the corner. (See Tr. 138-42.) Davis testified that he had observed Norman bagging crack in the basement of 642 Chauncey. (See id. at 458.) And Shakima had testified at Davis's criminal trial that she had seen Norman with crack. (See Trial Transcript in United States v. Davis, No. 09-CR-829 (E.D.N.Y. Dec. 16, 2010), at 225-27.)

**Access to 642 Chauncey:** Shakima testified that Norman was often present at 642 Chauncey. He came in and out of Jackson's house with a lot of different females, and she saw Jackson upset many times with Norman's coming into the house. (See Tr. 144.) Clara Jones testified that she observed Norman coming "in and out" of 642 Chauncey in October 2009. (Id. at 95.) Rasheem testified at the suppression hearing in Davis's criminal case that when Davis was living at 642 Chauncey, Rasheem and Norman were "very often" staying there as well. (Criminal Case Hearing at 177.) And as to one occasion when Jackson was not at home and Davis would not unlock the door or gate for Norman, both Shakima and Davis testified that Norman got into 642 Chauncey by climbing the canopy structures between 640 and 642 Chauncey and entering through a window. (See Tr. 144-48, 523-25.)

**Access to the police:** Velez and Lukeson had been partners for some four years before Davis was arrested (see Tr. 380, 338); Calhoun was their supervisor in 2009 (see, e.g., id. at 304); and the three were "friends" (Deposition of Javier Velez at 28-29; Deposition of Gary Calhoun at 126-27). The Norman Confession referred to the policemen whom Norman contacted to arrange Davis's arrest as the "Three Amigos." (Tr. 178.) To contact them, Norman said he had tried to reach Velez by telephone but had failed and had then tried Calhoun successfully. Velez testified that he in fact never

gave out his telephone number; Calhoun, however, admitted to sometimes giving his telephone number to citizens who might be able to give him information. And although defendants testified that they did not know and had never heard of Norman, Rasheem testified at the suppression hearing in Davis's criminal case that one of Norman's nicknames in the neighborhood was "T.I.," which meant "[a] snitch" (Criminal Case Hearing at 181-82). Evidence that Norman was widely regarded as a snitch could properly be viewed as providing some credence for the proposition that he had covert access to some policemen.

In their motion for summary judgment in this case, defendants had stated as undisputed facts, with citations to, inter alia, sworn testimony in Davis's criminal case, that "Terrell [sic] Norman was known in the neighborhood as a 'snitch'" (Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, ¶ 23); that "Terrell [sic] had been seen with drugs in packaging similar to the drugs allegedly found on plaintiff" (id. ¶ 27); and that "[d]uring the criminal trial, Shakima Jones recognized the gun allegedly found on Leroy Davis a[s] a gun previously belonging to Terrell [sic]" (id. ¶ 28). And in their in limine motion, defendants had noted that "Shakima Jones testified at [Davis's criminal] trial that she had heard Mr. Norman state 'I told you I was going to get him, yeah, I got him already.' Cr. Trial Transcript, p. 241:3-5." (Defendants' In Limine Memorandum at xv.)

If special corroboration is needed for the admission of statements against penal interest in civil actions, there was ample basis for the district court to find such corroboration for the Norman Confession here.

Finally, even if we were to conclude that the court's admission of the Norman Confession was error, we could not conclude that it affected defendants' substantial rights. As the district court noted in denying defendants' motion for a new trial, although the jury might have been

swayed by the evidence of the Norman Confession, that evidence was not likely to have had a material effect given the multiple implausibilities in defendants' own accounts of their actions and their claim that Davis had been carrying a bag that contained crack and a gun. For example:

■ Although Lukeson and Calhoun were in the front seats of the slowly patrolling car allegedly approaching Davis as he walked along Chauncey (see Tr. 348), neither Lukeson nor Calhoun saw Davis holding a bag, see D.Ct. Op., 15 F.Supp.3d at 239.

■ "Neither Lukeson nor Calhoun, riding in the same car [as Velez], corroborated [Velez's] testimony" that there was a "metallic" sound when a "plastic bag hit the ground." Id. at 240.

■ "[I]t might have been seen as unlikely that Velez would jump from a moving vehicle to verbally accost plaintiff without explaining to his partners what he had observed." Id.

■ Lukeson's excuse for taking Davis's keys and entering 642 Chauncey was his (and Velez's) testimony that Davis was not carrying any identification; but the officers could not explain away the fact that Davis had such identification when he arrived at the city jail some two days later; the theory advanced by Velez and Calhoun that someone might have brought Davis's identification to him at the precinct found no support in the precinct records relating to Davis's detention there, see id.

■ Lukeson, in search of the supposedly missing identification for Davis, took the keys carried by Davis and entered the dark and unfamiliar house at 642 Chauncey (see Tr. 386), apparently without telling Velez that was where he was going (see, e.g., id. at 301, 355). Even leaving aside the lack of any constitutional justifiability for that unauthorized entry, such an entry was simply reckless: Lukeson "could have been shot by nervous homeowners or attacked by guard dogs. It could have been seen as improbable that Lukeson would undertake this dangerous adventure without informing his partner, Velez, what he was doing. Jurors had reason to doubt Lukeson's explanation for why he entered the home, and to doubt Velez's claim that he had no idea Lukeson had taken plaintiff's keys and was planning to enter plaintiff's house." D.Ct. Op., 15 F.Supp.3d at 239-40 (emphasis added).

■ Although Lukeson and Calhoun testified that Lukeson was inside 642 Chauncey for only about half a minute, Shakima testified that she observed reflections suggesting people moving about with flashlights inside 642 Chauncey for closer to half an hour. And Holmes, who "appeared to be a reluctant witness" with "no apparent motive to lie," observed an officer bringing a box out of 642 Chauncey. Id. at 240.

■ Thus, even absent the Norman Confession, the "jurors could have concluded that defendants discovered the gun and drugs in someone else's room in 642 Chauncey St., or that defendants planted the evidence once their possible fishing expedition failed to yield any contraband." Id.

In light of the record, we see no abuse of discretion in the district court's denial of defendants' Rule 804(b)(3)-based motion for a new trial.

B. Jury Issues

Defendants also contend that they are entitled to a new trial because of jury-related issues. Each issue was appropriately dealt with by the district court, and none of these contentions warrants extended discussion.

1. Juror No. 8

Defendants contend that they are entitled to a new trial on the ground that the district court "failed to declare a mistrial when Juror 8, a juror whom we now know was voting in favor of defendants, failed to appear for deliberations." (Defendants' brief on appeal at 49; see also id. (at the end of the third day of deliberations, "Juror 8, after marching out of the jury room, was heard by defense counsel saying in sum and substance, 'I hope they never pick me again, I am sick of being here.' The following day Juror 8 did not appear for deliberations.").)

The record shows that on the fourth day of deliberations, December 17, the district court was informed that Juror 8 had called in and said he was ill and was on his way to see his doctor (see Tr. 674); he informed the court that he suffered from high blood pressure and "ha[d] been ill for the past two days" (id. at 675-76). The court exercised its discretion to "excuse a juror for good

cause," Fed. R. Civ. P. 47(c), which includes sickness. The court was not required to order a mistrial.

Following defendants' posttrial motion for a new trial on the ground that the court should have adjourned the trial until Juror 8 could return for deliberations, the court conducted a posttrial hearing on March 21, 2014:

> Juror 8 testified under oath via telephone at the March 21, 2014 hearing. He explained that his physical condition "was horrible" on the morning of December 17 and that he was suffering from chest pains, anxiety, and "some bleeding." Hr'g Tr. 72:25-73:1. He confirmed that he was "absolutely not" physically capable of continuing with deliberations. Hr'g Tr. 73:7. When asked if he felt "pressured off the jury," Juror 8 signaled that he felt some general pressure related to the deliberation process, but expressly rejected the suggestion ("no, no, no") that he was pressured off the jury. Hr'g Tr. 73:22-73:23.

D.Ct. Op., 15 F.Supp.3d at 251. On the basis of these responses, the court found that

> while Juror 8's alleged comment ("I'm sick of being here") indicated frustration with the deliberation process, it was not a "red flag" signaling that he was a "hold out." It would be surprising if an active and involved juror was not growing somewhat frustrated after three days of deliberations. The comment alone was not enough to trigger a fuller investigation on the court's part. Second, any further investigation would have confirmed what was already known: that Juror 8 was sick, in the process of obtaining medical relief, and physically unable to continue with deliberations. The dismissal was warranted.

Id. We see no error or abuse of discretion in this decision.

2. Extraneous Materials in the Jury Room

Defendants also sought a new trial on the ground that the jury's deliberations had been tainted by two types of extraneous materials that were brought into the jury room: "(1) a copy of the Wall Street Journal containing an article suggesting that a Nassau County police official was corrupt, and (2) two bags allegedly used to test aspects of defendants' story." D.Ct. Op., 15 F.Supp.3d

at 240-41. Extra-record materials used in jury deliberations are presumptively prejudicial, but "[t]hat does not . . . mean that a new trial is required whenever a juror has been exposed to extrinsic information," Manley v. AmBase Corp., 337 F.3d 237, 251 (2d Cir. 2003). When a new trial is sought based on the introduction of extra-record evidence during jury deliberations, the trial court has broad discretion to deny the motion if it finds, in light of "(1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury," id. at 252 (internal quotation marks omitted), that the impropriety has not had a prejudicial effect, see, e.g., United States v. Weiss, 752 F.2d 777, 783 (2d Cir.), cert. denied, 474 U.S. 944 (1985); Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 282 (4th Cir.) ("Experiments performed by juries . . . constitute jury misconduct requiring a new trial, unless no prejudice results."), cert denied, 528 U.S. 877 (1999). "The effect inquiry properly considers the entire record in making an objective assessment of possible prejudice." United States v. Farhane, 634 F.3d 127, 169 (2d Cir.) (internal quotation marks omitted), cert. denied, 132 S. Ct. 833 (2011). The district court here held a hearing to conduct such an inquiry.

a. The Newspaper

At the March 21 hearing, Juror 9 testified that it had been his habit to bring the Wall Street Journal to court with him, and that on Friday, December 13, 2013, the newspaper contained an article about police misconduct. He could not recall the article's specific contents. Juror 7 testified that Juror 9 brought in and was waving around a newspaper article about a "dirty cop on Long Island," saying that "if this cop could be dirty, [the defendants] could be dirty" (Hearing Transcript, March 21, 2014 ("March 21 Hearing Tr."), at 11). Juror 7 could not remember any specifics of the article or recall which newspaper published it, but she said she had prevented the article from being shown to

the other jurors because it was irrelevant to the case. The court found that the December 13, 2013 edition of the Wall Street Journal carried a story that detailed the resignation of the Nassau County police commissioner, who had been accused of ordering the arrest of a man for outstanding court fines at the behest of a political donor. See D.Ct. Op., 15 F.Supp.3d at 242.

An attorney from New York City's Office of Corporation Counsel testified that he interviewed Juror 9 on December 17 shortly after deliberations ended. He suggested that Juror 9 may have had the December 13 article with him then. However, the attorney neither saw what newspaper Juror 9 was carrying nor read any part of that paper.

The court found that the December 13 Wall Street Journal article described "alleged wrongdoing [that] did not involve fabrication of evidence, false testimony, or other misconduct by defendants or New York City Police Department officers"; that Juror 9 had the article in court only on December 13 as he testified; and that Juror 9 had no improper motive in bringing the newspaper. D.Ct. Op., 15 F.Supp.3d at 242. The court's conclusion that this event did not warrant a new trial was not an abuse of discretion.

b. The Bag Demonstrations

Finally, there was evidence at the March 21 Hearing that jurors conducted more than one experiment or "demonstration" (March 21 Hearing Tr. 15) with respect to defendants' testimony that Davis had carried a bag that held soda, chicken, crack, and a gun and that Velez fathomed the presence of a gun from the sound of the bag hitting the ground. Juror 7 testified that she brought a "larger . . . black bag, like the kind that holds two bottles of wine," to show other jurors it was possible to fit those items in one plastic bag. (Id. at 13-14.) Two jurors testified that Juror 8 brought in a

plastic bag, filled it with items similar to those Davis had allegedly been carrying, and dropped it to "demonstrate that . . . a loud enough sound . . . could be made" for Velez to hear Davis's gun hit the ground from his police car (id. at 38). Juror 7 then brought in a can of soup to place in a bag, planning to show that a metallic sound can be produced by anything metallic.

The court stated that it was unclear whether it was appropriate to receive such testimony from the jurors, given that, with respect to the validity of a jury verdict,

> Federal Rule of Evidence 606 prohibits testimony "about any . . . incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."

D.Ct. Op., 15 F.Supp.3d at 244 (quoting Fed. R. Evid. 606(b)(1)). However, noting the Rule 606 exceptions that allow "[a] juror [to] testify about 'extraneous prejudicial information' or whether 'an outside influence was improperly brought to bear on any juror,'" D.Ct. Op., 15 F.Supp.3d at 244 (quoting Fed. R. Evid. 606(b)(2)(A) and (B)), the court proceeded on the assumption that the evidence as to the juror demonstrations was properly before it.

The court noted that all of the experiments or demonstrations concerned whether a bag could contain a soda, a box of chicken, bags of crack, and a gun, and whether a bag that contains a metal object makes a sound when it falls to the ground, see D.Ct. Op., 15 F.Supp.3d at 245. The court found these events inconsequential:

> [T]he "experiment" of dropping a bag with "stuff in [it]" would not generate any information or data that would be novel for an average juror. A juror can be expected to infer the sound, or range of sounds, a dropped bag with diverse contents might make upon hitting the ground from years of living.

Id. The court concluded that these events did not generate "a seriously erroneous result" or produce "a miscarriage of justice." Id. at 244 (internal quotation marks omitted). In light of the record, we

cannot conclude that the denial of a new trial on the basis of experiments or demonstrations as to the capacity and acoustic properties of plastic bags was an abuse of discretion.

C. Other Contentions

Defendants also complain of evidentiary rulings in addition to the admission of Rule 804(b)(3) evidence; and Lukeson and Calhoun contend that the court should have granted judgment as a matter of law dismissing Davis's malicious prosecution claims against them. These contentions need not detain us long.

1. Evidentiary Rulings

Defendants argue that the district court should have allowed them to impeach Davis's credibility with evidence of his prior felony convictions (see defendants' brief on appeal at 44-48), especially since the court allowed Davis to introduce evidence of "bad acts" by Norman (id. at 44). We disagree. As noted in Part II.A.2. above, the evidence as to Norman's conduct with regard to drugs and guns was relevant to show his habitual access to the type of contraband for which Davis was arrested. In contrast, the district court found that Davis's prior convictions, for firearms offenses, had little relevance for impeachment purposes. Two of them were very old; and the court found that, given the age and nature of the convictions, their probative value as to Davis's truthfulness would be "minimal," D.Ct. Op., 15 F.Supp.3d at 252-53. And the jury, in assessing the existence of probable cause for Davis's arrest for carrying a gun, could be unduly influenced by the fact that he had previously been convicted of firearms offenses. Thus, the court excluded evidence of Davis's prior convictions after a Rule "403" balancing analysis. (Hearing Transcript, November 25, 2013, at 30.)

We see no abuse of discretion in the court's ruling that the danger of unfair prejudice from the evidence of Davis's prior convictions substantially outweighed the evidence's probative value.

Defendants also contend that the Norman Confession should have been excluded from evidence pursuant to Rule 403 as unfairly prejudicial to defendants because it was "of such questionable reliability." (Defendants' brief on appeal at 35.) This contention is, at bottom, simply an attack on the credibility of Shakima in recounting the Confession. However, where a hearsay "'declaration comes within a category defined as an exception, the declaration is admissible without any preliminary finding of probable credibility by the judge.'" United States v. DiNome, 954 F.2d 839, 846 (2d Cir.) (quoting United States v. DiMaria, 727 F.2d 265, 272 (2d Cir. 1984)), cert. denied, 506 U.S. 830 (1992). Credibility questions go to the weight of the evidence, which "is a matter to be argued to the trier of fact, not a basis for reversal on appeal," SEC v. Razmilovic, 738 F.3d 14, 35 (2d Cir. 2013), cert. denied, 134 S. Ct. 1564 (2014).

2. The Contention that Lukeson and Calhoun Were Entitled to Judgment as a Matter of Law Dismissing the Claims Against Them for Malicious Prosecution

Lukeson and Calhoun contend that the district court should have granted judgment as a matter of law in their favor on Davis's claims of malicious prosecution, pointing out that it was Velez who forwarded Davis's case to the prosecutors and arguing that Lukeson and Calhoun had no role in the initiation or continuation of the prosecution, which is an essential element of that claim, see generally Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010). Although the district court denied their motions for judgment as a matter of law, it found the issue close.

Given that Lukeson admitted that he had entered 642 Chauncey, and that the jury could

credit the testimony of Holmes that "he saw an officer emerge from the house with a box (plausibly with evidence against [Davis])" and show it to another officer, D.Ct. Op., 15 F.Supp.3d at 240, the jury could infer that the officer who exited 642 Chauncey with the box was Lukeson, and that the officer to whom he showed the box was Calhoun, who, the court noted, "was in charge of the unit of three at the scene" (Tr. 510). Further, the court noted that Calhoun "was in a position to see that one of his men was going in and, if the plaintiff's witness is to be believed, for a substantial length of time searching around so that he was in a position to observe that [Lukeson] was lying when he said that he just went in for a few seconds, and he was in a position to see that the total presentation must have been inappropriate and wrong." (Id.) Given that the jury could have discredited Lukeson's explanation for entering 642 Chauncey, see, e.g., D.Ct. Op., 15 F.Supp.3d at 239-40, the "jurors could have concluded . . . that defendants planted the evidence once their possible fishing expedition failed to yield any contraband," id. at 240.

The court stated that even if defendants were entitled to immunity with respect to "their own testimony" against Davis in the criminal case, Calhoun "should have been aware" during the prosecution of Davis "that his fellow officer [Lukeson] was lying," and the court would "not decid[e]" that they were "immune for not bringing to the [criminal c]ourt's attention the false testimony of somebody else." (Tr. 512-13; see id. at 697.)

Had all of the defendants not persisted in their version of the basis for Davis's arrest, the criminal prosecution of Davis would likely have come to a halt. We have not squarely dealt with the question of whether trial evidence such as that presented in this case--which, taken in the light most favorable to the plaintiff, with all credibility assessments made in his favor, permits the inference of defendants' collusive fabrication of the sole evidence grounding the subsequent prosecution--is

sufficient as a matter of law to prove the initiation/continuation element of a claim for malicious prosecution. We have noted, however, in dealing with appeals from grants or denials of summary judgment, that "a person is responsible for the natural consequences of his actions," e.g., Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000) (internal quotation marks omitted); and we have said that "[t]o hold that police officers, [even if they] lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice," Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 130 (2d Cir. 1997). We conclude, however, that this case is not an appropriate one in which to further explore the initiation/continuation element of malicious prosecution because, in light of the manner in which the matter was presented to and resolved by the jury, we cannot see that the challenge by Lukeson and Calhoun, if upheld, would affect the final judgment.

The jury was asked to decide, with respect to each of the three defendants, Davis's three § 1983 claims: false arrest, i.e., arrest without probable cause; malicious prosecution, i.e., initiating or continuing a prosecution without probable cause and with malice; and denial of a fair trial, i.e., creating materially false evidence and sending it to the prosecutor. (See Tr. 620-26.) The jury was given a separate verdict sheet with respect to each defendant, with each sheet listing the three § 1983 claims. It was instructed that as to each claim against each defendant it must find whether or not Davis had proven that defendant's liability. The jury was then instructed, "if you find any of th[e three theories of liability] proved" against a given defendant, "you'll find damages" against that defendant. (Id. at 630 (emphasis added).)

As to each defendant, the jury found all three of Davis's § 1983 claims proven. It awarded compensatory damages to Davis against all three defendants. And, having been instructed

that it had discretion to award punitive damages against a defendant if it found that defendant to have acted with malice or with reckless indifference to Davis's rights (see id. at 628), the jury awarded punitive damages against all three defendants.

The jury was not asked to apportion an award of its damages against a given defendant among the theories of liability if it found more than one theory proven, and it did not do so. (See Tr. 630, 687-90, 693-94.) Defendants do not argue that it was error to instruct the jury to award damages to Davis if it found "any" of his three § 1983 theories of liability proven; nor do they argue that it was error not to submit more specific questions to the jury that might reveal its relative evaluations of Davis's theories.

Given the similarities between the malicious prosecution claims and the fair trial claims, and the absence of any challenge by defendants to the legal sufficiency of the evidence to support the verdicts on the fair trial claims, we conclude that even if we were persuaded that the malicious prosecution claims against Lukeson and Calhoun should have been dismissed, there would be no basis on which to overturn the verdicts against them for denial of a fair trial or to find that the damages awarded were impermissible with respect to the fair trial verdicts.

Since a decision on the malicious-prosecution-claim challenges of Lukeson and Calhoun would have no effect on the judgment against them, we decline to further consider those challenges.

## CONCLUSION

We have considered all of defendants' remaining contentions on this appeal and have found them to be without merit. The judgment of the district court is affirmed.